# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-1634V
UNPUBLISHED

|  |  |
|---|---|
| W.B.,<br><br>       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>       Respondent. | Chief Special Master Corcoran<br><br>Filed: August 7, 2020<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barre Syndrome<br>(GBS) |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA,* for petitioner.

*Adriana Ruth Teitel, U.S. Department of Justice, Washington, DC,* for respondent.

## DECISION AWARDING DAMAGES[1]

On October 23, 2018, W.B. filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain Barré syndrome ("GBS") as a result of receiving the influenza ("flu") vaccination on September 12, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount **$172,104.02**, representing compensation in the amount of **$155,000.00** for actual pain and suffering, **$7,304.02** for past unreimbursed medical expenses**,** and **$9,800.00** for lost wages.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.     Relevant Procedural History

Approximately 13 months after this case was initiated, Respondent filed his Rule 4(c) Report on November 22, 2019, conceding that Petitioner was entitled to compensation. ECF No. 30. A ruling on entitlement was issued on November 25, 2019. ECF No. 31. The parties thereafter attempted to informally resolve damages but were unsuccessful. ECF No. 38. A status conference was held the next month, and a scheduling order was issued on March 25, 2020, regarding the briefing of disputed damages issues. ECF No. 39. The parties filed their respective briefs (ECF Nos. 42 ("Br."), 44 ("Opp."), and 46 ("Resp.")). I proposed that the parties be given the opportunity to argue their positions at a motions hearing, at which time I would decide the disputed damages issues. ECF. No. 48. That hearing was held on July 31, 2020,[3] and the case is now ripe for a determination.

## II.    Relevant Medical History

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) Report. In brief summary, on September 12, 2016, Petitioner received a flu vaccine. Ex. 1 at 4. Prior to vaccination, Petitioner was a generally healthy and very active medical doctor, including running cross country, racing Ironman triathlons, racing road bicycles, and cross country and back country skiing. Ex. 7 at 1. Petitioner's medical history was, however, significant for some injuries bearing on damages – specifically, a right shoulder dislocation, torn labrum, and surgical repair due to a bicycle crash in March 2015, and gastroesophageal reflux disease (GERD). Ex. 2 at 49, 71-75, 82-85.

According to Petitioner, a little more than three weeks after vaccination, on October 6, 2016, after he finished a late emergency room (ER) shift, he started to feel very ill, including uncontrollable shaking, profound fatigue, increasing muscle pain and a sense of weakness, but no fever. Ex. 7 at 3. Petitioner continued to experience symptoms, including difficulty feeding his children. *Id.*

On October 9, 2016, Petitioner presented to the hospital with complaints of hand weakness, generalized weakness, and significant myalgias. Ex. 5 at 7. The decision was made to admit him for IVIG therapy, and for a neurology reevaluation in the morning. *Id.* at 8. After receiving the first IVIG treatment, Petitioner reported that his symptoms were a little better. *Id.* at 5. His neurologist determined that as long as Petitioner continued to improve, he could continue the remainder of his IVIG course at home. *Id.* at 5-6.

Petitioner was discharged from the medical center on October 10, 2016, after receiving his second IVIG treatment with a diagnosis of "Probable Guillain-Barre." Ex. 5 at 3. Petitioner received three IVIG treatments as an outpatient on October 11-13. *Id.* at 150-155, 276-280. Petitioner received a total of five IVIG treatments. *Id.* Over the course

---

[3] At the end of the hearing held on July 31, 2020, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

2

of the next several weeks, Petitioner's weakness improved, and he continued to get stronger, but still experienced some fatigue and other symptoms. By November 8, 2016, Petitioner had resumed working half-day shifts and doing yard-work, although both activities resulted in fatigue. Ex. 4 at 66-67.

On November 30, 2016, Petitioner presented to his primary care physician with shoulder pain. Ex. 4 at 25. Petitioner had fallen while carrying his son and thought he may have torn his rotator cuff. *Id.* On exam, it was noted that Petitioner was positive for paresthesia and weakness (left leg felt atrophied and weak compared to right light). Petitioner continued to have instability in his upper extremities, and physical therapy (PT) was recommended. Ex. 4 at 62-66.

On December 29, 2016, Petitioner had a PT evaluation for bilateral shoulder pain and diminished strength. Ex. 6 at 10. Petitioner thereafter received PT through August 21, 2017, his twenty-ninth PT session. *Id.* at 130. Petitioner conveyed that he was "doing well," and was "more active and doing more things on his own," so he thought he was ready to "graduate." *Id.* The therapist agreed, and discharged Petitioner to continue with a home exercise program. *Id.* at 131.

Almost a year later, in late November 2017, Petitioner saw his primary care physician for a follow-up visit. Ex. 4 at 21. His GBS was deemed largely resolved, with symptoms mostly absent other than fatigue that expressed itself after exertion. *Id.* Petitioner at this time also mentioned his GERD, although the record does not suggest it was a significant concern at this time. *Id.* at 21. By his April 2018 follow-up, Petitioner noted that he felt even better, other than experiencing weakness that "never went fully away." *Id.* at 57. And beyond absent reflexes in his right bicep, his clinical examination, including strength, was normal. *Id.* at 57-58.

The GERD that Petitioner had experienced pre-vaccination came up around this time again. On May 9, 2018, on referral from his primary care physician, Petitioner was evaluated by gastroenterologist, Dr. Van Kleek. Ex. 4 at 53. Petitioner reported doubling his GERD medication and it was also noted that "[a]ll of this worsened after he got Guillain-Barre syndrome after a flu shot," although the records do not go further in causally linking the two. *Id.*

By July 16, 2019, Petitioner conveyed to his primary care physician that "after three years, [he] finally feels like he is getting back to normal. He is back to biking and exercising at his previous level." Ex. 15 at 4. Under plan, it was noted that his GBS had "improved, he will continue to monitor," GERD "stable, continue with current treatment modalities," and dysthymic disorder "stable, continue with current treatment modalities." *Id.* at 6.

On March 17, 2020, petitioner presented to an orthopedist with a chief complaint of right shoulder pain. No positive findings were noted under neurologic, with it reflecting petitioner denied having "numbness, weakness, or tingling," among other symptoms. Ex. 16 at 7. The impression was "rotator cuff strain superimposed on chronic instability with history of 2 instability procedures." *Id.* at 9. Treatment options were discussed, and it was decided petitioner would start with PT specific to this complaint. *Id.*

### III.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### IV.   Appropriate Compensation in this Matter

#### A. Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of petitioner's injury.

With respect to the severity and duration of the injury, Petitioner's medical records and his affidavit provide a description of the pain he experienced throughout the duration of his injury, and which he deemed significant. Br. at 24. While Petitioner notes that prior Vaccine Program cases involving GBS are "instructive in some capacity," he acknowledges that "factual circumstances vary." *Id.* at 25. Petitioner highlights his relative youth when the injury occurred, the fact that he is now medically advised against vaccination in the future (which in light of his profession as a physician puts him at "substantial risk for the remainder of his professional career"). and his concomitant exacerbated shoulder pain. *Id.* Petitioner submits that "a net present value of $225,000 is a reasonable and appropriate award for past and future pain and suffering" in this case. *Id.* at 25-26.[5]

Respondent, on the other hand, while in no way intending "to minimize the pain and suffering experienced by [P]etitioner here," argues that his "clinical course documented by his medical records demonstrates a less severe course of GBS than others, comparatively speaking." Opp. at 14. Respondent notes that petitioners in other cases required extensive hospitalization followed by in-patient rehabilitation, some patients remained dependent on wheelchairs, walkers, or canes, and some experienced respiratory issues necessitating intubation. *Id.* In addition, Petitioner's hospitalization was limited to one night, followed by three days of outpatient IVIG, he never required assistance to ambulate, never experienced respiratory issues requiring acute intervention, and largely had recovered two and one-half years after the vaccination at issue. *Id.*, *citing* Ex. 15 at 4; Br. at 2. As a result, Petitioner's overall harm was "mild compared to other GBS claims," making an award of $105,000.00 appropriate. Opp. at 14, 16.

After reviewing the record in this case and considering the parties' arguments during the hearing, I find that the complete record in this case supports the overall

---

[5] To support an award of this magnitude, Petitioner cited to *Johnson v. Sec'y of HHS*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering); *Dillenbeck v. Sec'y of HHS*, 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $180,857.15 for pain and suffering); *Fedewa v. Sec'y of HHS*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) (awarding $180,000 for pain and suffering); *Presley v. Sec'y of HHS*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. March 23, 2020) (awarding $180,000 for pain and suffering).

conclusion that Petitioner's condition, while serious, was on the mild end of severity of GBS cases. In the cases cited by Petitioner where pain and suffering awards ranged from $170,000.00 to $180,000.00, the injured parties experienced far worse courses of treatment - hospitalized for at least five days, required inpatient rehabilitation, required multiple rounds of IVIG, could not ambulate or required an assistive device for ambulation, suffered persistent incontinence and numbness, could no longer work or was out of work for several months, attended far more PT visits, and continued to require medication for pain. *See Johnson* 2018 WL 5024012, at *7-8; *Dillenbeck* 2019 WL 4072069, at *14; *Fedewa* 2020 WL 1915138, at *6; *Presley* 2020 WL 1898856, at *13. Here, by contrast, Petitioner's treatment was of a far shorter and less invasive duration, nor does the record indicate that he has experienced long-lasting treatments or deficiencies. Ex. 15 at 4. For these reasons, I cannot find that the GBS injury and its sequelae were of such high severity to justify an award of the magnitude requested by Petitioner.

Nevertheless, GBS is a serious injury, and Petitioner's pain and suffering award should be calculated with that in mind. Prior to vaccination, Petitioner was very active and healthy, which likely contributed his eventual recovery, but also underscores the impact his illness had on his life. During the months following his GBS diagnosis, Petitioner did suffer the loss of enjoyment of activities in which he once participated. Additionally, Petitioner's leg weakness caused him to suffer a fall while carrying his child, reinjuring his shoulder, and subsequently requiring PT. Also, Petitioner explained that he has been advised to avoid vaccinations in the future, and as a physician, where exposure to viruses is inherent, Petitioner may be exposed to a certain amount of risk for the remainder of his professional career. Br. at 25. This factor does not appear to have impacted his future wages or career growth, and therefore I do not give it high value, but it is worthy of consideration. For these reasons, I find that Respondent's recommendation of $105,000.00 is far too modest.

Balancing the severity of a GBS injury and Petitioner's personal loss, with relatively low severity of disease course and treatment requirements, and considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$155,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

### B. Past Unreimbursed Expenses

Petitioner requests $10,942.55 in past unreimbursed expenses. Br. at 20. Respondent, however, proposes only reimbursing Petitioner a total of $7,304.02. The disputed amounts represent a visit with Petitioner's gastroenterologist and diagnostic endoscopic procedures on May 9, 2018, and July 12, 2018, respectively, all related to Petitioner's GERD symptoms.

6

It has not been established by Petitioner that this subset of costs is properly considered a GBS sequela. According to Petitioner's primary care physician, Petitioner had "long-standing heartburn symptoms which go back to when he was in medical school." Ex. 15 at 24. Although Petitioner doubled his GERD medication at some point after his GBS diagnosis, and it was noted that "[a]ll of this worsened after he got Guillain-Barré syndrome after flu shot," there is no indication that his primary care physician, gastroenterologist, or any other physician linked or established a causal connection between Petitioner's GERD symptoms or the exacerbation thereof, to Petitioner's GBS. *See* Ex. 9 at 5.

Accordingly, I agree with Respondent that the medical expenses Petitioner incurred for GERD-related evaluations are not compensable as part of damages. I thus find that Petitioner is entitled to **$7,304.02** for past unreimbursed medical expenses.

### C. Award for Future Unreimbursed Medical Expenses

Petitioner requests $6,000.00 for future costs for twelve PT sessions per year from now through 2025 for treatment of his right shoulder injury. Br. at 20-22. Respondent, however, maintains that Petitioner's request is not supported by the evidence. Opp. at 12. As with the request for GERD-related post-vaccination treatment, this damages component has not preponderantly been connected to Petitioner's vaccine injury.

In November 2016, Petitioner sustained a fall that was more likely than not related to his GBS. Ex. 4 at 25. Over three years later, however, on March 17, 2020, Petitioner presented to PT because of "shoulder pain that began in ***November 2019*** when he was pulling up on a wrench with his arm in abduction and felt a 'crack' and pain in his anterior shoulder axillary region." Ex. 16 at 6 (emphasis added). The medical record from this visit further states that "[Petitioner] was doing well after his second surgery until a fall in 2016. He did more P.T. after his fall and felt his pain was mainly resolved." *Id*. Therefore, while Petitioner's November 2016 fall was likely related to his GBS, the medical evidence demonstrates that he completed PT for that injury, and his pain had mainly resolved. Petitioner's current pain, for which he is requesting future medical costs, is for an unassociated injury. Accordingly, I find that Petitioner has not established that these costs are reasonably associated with treatment of his GBS; therefore, I find that Petitioner is not entitled to any compensation for future unreimbursed medical expenses.

### D. Award for Lost Wages

The parties agree on the amount of $9,800.00 for past lost wages. Opp. at 10. That sum is adopted in this damages decision.

### V.  CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $172,104.02,** (representing $155,000.00 for Petitioner's actual pain and suffering, $7,304.02 for past unreimbursed medical expenses, and $9,800.00 in lost wages) **in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id.*

The clerk of the court is directed to enter judgment in accordance with this decision.[6]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.